**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Joy Shawver, | : | Case No. 4:12-cv-01648 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **MEMORANDUM AND** |
| | : | **ORDER** |
| Defendant. | : | |

**I. INTRODUCTION**

Plaintiff Joy Shawver ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g)

of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her

claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and

1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 20 and 21). For

the reasons that follow, the decision of the Commissioner is affirmed in part and remanded in

part.

1

## II. PROCEDURAL BACKGROUND

On February 25, 2009, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 10, p. 177 of 685). Two days later, on February 27, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, p. 169 of 685). In both applications, Plaintiff alleged a period of disability beginning January 3, 2008 (Docket No. 10, pp. 169, 182 of 685). Plaintiff's claims were denied initially on July 21, 2009 (Docket No. 10, pp. 105, 108 of 685), and upon reconsideration on January 11, 2010 (Docket No. 10, pp. 114, 121 of 685). Plaintiff thereafter filed a timely written request for a hearing on March 11, 2010 (Docket No. 10, p. 128 of 685).

On July 20, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Jeffrey LaVicka ("ALJ LaVicka") (Docket No. 10, pp. 36-79 of 685). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 10, pp. 73-78 of 685). ALJ LaVicka found Plaintiff to have the following severe impairments: cervical radiculopathy, osteoarthritis of the lumbar spine, occasional migraine headaches, history of fibromyalgia, anxiety, an organic mental disorder, and affective disorder (Docket No. 10, p. 21 of 685).

Despite these limitations, ALJ LaVicka determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 10, p. 29 of 685). ALJ LaVicka found Plaintiff had the residual functional capacity to perform light work except that the type of work must:

    1.    Provide a sit/stand option, allowing Plaintiff to change between sitting and standing for one to two minutes at thirty minute intervals without breaking task

2

2.      Entail no climbing of ladders/ropes/scaffolds and no more than occasional other postural movements

3.      Entail no exposure to hazards (i.e. unprotected heights or dangerous machinery)

4.      Be limited to simple, routine, and repetitive tasks in a work environment free of fast paced production and involving simple work-related decisions with few, if any, work place changes

5.      Entail no more than occasional interaction with the public and co-workers

(Docket No. 10, p. 22 of 685). ALJ LaVicka found that Plaintiff was unable to perform any of her past relevant work, but able to perform other work in the economy  (Docket No. 10, p. 27 of 685). Plaintiff's request for benefits was therefore denied (Docket No. 10, p. 29 of 685).

On June 26, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged that the ALJ failed to appropriately assess Plaintiff's credibility and apply the treating physician rule (Docket No. 20). Defendant filed its Answer on August 30, 2012 (Docket No. 9).

### III. FACTUAL BACKGROUND

**A.      THE ADMINISTRATIVE HEARING**

An administrative hearing convened on July 20, 2011, in Morgantown, West Virginia (Docket No. 10, pp. 36-79 of 685). Plaintiff, represented by counsel Paul W. Newendorp, appeared and testified via video from Wheeling, West Virginia (Docket No. 10, pp. 42-73 of 685). Also present and testifying was VE Larry Bell ("VE Bell")  (Docket No. 10, pp. 73-78 of 685).

1.     PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a forty-two year old female with one nine year-old daughter (Docket No. 10, pp. 42-43 of 685). Plaintiff was separated from her husband (Docket No. 10, p. 42 of 685).[1] Plaintiff testified that she graduated from high school (Docket No. 10, p. 48 of 685).  Plaintiff indicated that she received public assistance in multiple forms, including food stamps, which provided her with $503 per month, medical care, and subsidized rent (Docket No. 10, pp. 42-44 of 685). Plaintiff testified that her spouse's parents also contributed $300 to her monthly income (Docket No. 10, p. 43 of 685). Plaintiff is a smoker, stating that she smokes one to one and a half packs of cigarettes per day (Docket No. 10, pp. 46-47 of 685).

With regard to her work history, Plaintiff testified that she last worked in 2004 as a pharmacy technician for CVS Pharmacy (Docket No. 10, p. 50 of 685). Plaintiff was a full-time employee making approximately eight dollars per hour (Docket No. 10, p. 50 of 685). Her duties included counting pills, putting away orders, and ringing the register (Docket No. 10, p. 50 of 685). Plaintiff quit this job due to her migraine headaches and back and leg pain (Docket No. 10, p. 51 of 685). Plaintiff indicated that these ailments caused her to have multiple absences (Docket No. 10, p. 51 of 685). Prior to CVS, Plaintiff worked at Apple Discount Drugs as a pharmacy technician (Docket No. 11, pp. 51-52 of 685). Before that, Plaintiff worked in the credit card division of a bank, making between $24,000 and $27,000 annually (Docket No. 10, p. 52 of 685). Plaintiff testified that she also worked at a Saks Fifth Avenue distribution center as a terminal adjuster (Docket No. 10, pp. 53-54 of 685).

---

[1] Plaintiff explained that her husband had been living with her and their daughter, but he may or may not be living with them in the future due to a pending divorce (Docket No. 10, p. 44 of 685).

4

When asked to name her most debilitating ailment, Plaintiff cited the pain in her lower back, pelvis, legs, and shoulders (Docket No. 10, p. 55 of 685). Plaintiff stated that this pain began in 2002 and had become progressively worse (Docket No. 10, p. 55 of 685). This pain interfered with Plaintiff's ability to work because she "[couldn't] function" and the pain exacerbated her depression and left her with an inability to "get out of bed" (Docket No. 10, p. 55 of 685). Plaintiff also experiences joint pain and muscular fatigue for which she takes Morphine three times per day (Docket No. 10, p. 56 of 685). Plaintiff testified that she had done physical therapy in an attempt to alleviate the pain, but that it was ineffective and only served to exacerbate the pain (Docket No. 10, pp. 56-57 of 685). Plaintiff stated that her pain forces her to lay down daily (Docket No. 10, p. 66 of 685). Plaintiff cited her trouble sleeping, claiming she gets an average of three hours of uninterrupted sleep per night (Docket No. 10, pp. 66-67 of 685).

Plaintiff also testified that she suffered from migraine headaches (Docket No. 10, p. 58 of 685). Plaintiff stated that she suffers from "complex migraines" twice per year, but is plagued with typical headaches two to three times per week (Docket No. 10, p. 70 of 685). Plaintiff indicated that she stopped taking medication for the headaches due to side effects (Docket No. 10, p. 58 of 685).[2]

Plaintiff stated that she had been suffering from depression "on and off for years" (Docket No. 10, p. 57 or 685). She has seen a psychotherapist since 2003, once every one to two months (Docket No. 10, p. 57 of 685). Additionally, Plaintiff stated that she goes to counseling every other week (Docket No. 10, p. 57 of 685). In addition to depression, Plaintiff indicated that

---

[2] Plaintiff stated that Topamax left her with numb fingers and toes and sensitivity to light. Plaintiff also stated that Propanol lowered her blood pressure "down to very low" (Docket No. 10, p. 58 of 685).

she suffered from anxiety, noting that she had previously attempted to take her own life (Docket No. 10, p. 59 of 685). Plaintiff noted that her anxiety gave her heart palpitations and increased sweating (Docket No. 10, p. 60 of 685).

With regard to her residual functional capacity, Plaintiff indicated that she and her husband take care of their daughter (Docket No. 10, p. 61 of 685). Plaintiff testified that her husband cooks and does the grocery shopping (Docket No. 10, pp. 61-62 of 685). Plaintiff indicated that she does laundry once per week and goes shopping once per month if "[she is] lucky" (Docket No. 10, p. 62 of 685). Plaintiff also stated that she makes her bed everyday, dusts, and wipes down the bathroom sink and toilet (Docket No. 10, pp. 62-63 of 685). Plaintiff's husband bends down to clean the bathroom tub and also helps fold the laundry (Docket No. 10, p. 63 of 685). Plaintiff stated that her pain level dictates her activity on any given day and that her bad days outweigh her good (Docket No. 10, pp. 67-68 of 685).[3] On bad days, Plaintiff explained that she would either remain in her bedroom or watch a movie on the couch with her daughter (Docket No. 10, p. 68 of 685). Plaintiff also indicated that she can dress and bathe herself (Docket No. 10, p. 61 of 685).

Plaintiff stated that she had a valid driver's license and drives three to four times per week (Docket No. 10, pp. 44-45 of 685). Plaintiff testified that outside the house, her activities included visiting her parents and going to church on Sundays (Docket No. 10, pp. 64-65 of 685). When asked about visiting others, Plaintiff indicated that she drove seven hours alone to Lancaster, Pennsylvania to escape from the stress of her marriage (Docket No. 10, p. 65 of 685). Plaintiff testified that she could not perform a sedentary job and estimated that, because of her

---

[3] Plaintiff indicated that she is only "able to do more things around the house" an average of three days per week (Docket No. 10, p. 67 of 685).

6

pain and its variability, she would have to miss an average ten days of work per month (Docket

No. 10, pp. 69-70 of 685).

### 2.   VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the

hearing, the VE described Plaintiff's past work as a customer service representative as sedentary

and semi-skilled, a terminal adjuster clerk as sedentary and semi-skilled, and a pharmacy

technician as light and semi-skilled (Docket No. 10, p. 75 of 685).

ALJ LaVicka then posed the following hypothetical question:

Assume a hypothetical individual of the same age, education, and work experience of the
[Plaintiff] who has to perform light work. For the sit/stand option along with breaks of 1-
2 minutes alternate sitting/standing positions at 30-minute intervals throughout the day
without going off-task, is limited to occasional posturals with no climbing of ladders,
ropes or scaffolds.

Must avoid all exposure to unprotected heights and hazardous machinery, whose work is
limited to simple, routine, repetitive tasks in a work environment free of fast-paced
production requirements involving only simple, work-related decisions with few, if any,
workplace changes, who can have only occasional interaction with public and coworkers.

Could such an individual perform the past work of the claimant as it was actually
performed or as it was customarily performed per the DOT?

(Docket No. 10, pp. 75-76 of 685). Taking into account these limitations, the VE testified that

such an individual would not be able to perform any of Plaintiff's past relevant work (Docket

No. 10, p. 76 of 685). The VE stated that there were other jobs in the national economy that such

an individual could perform, including: (1) office helper, listed under DOT 239.567-201, for

which there are 150,000 positions nationally and 1,850 regionally; and (2) garment marker and

sorter, listed under DOT 222.687-014, for which there are 90,000 positions nationally and 1,100

regionally (Docket No. 10, p. 76 of 685). When asked about employer policies concerning

tardiness and unexcused absences, the VE testified that employers customarily have a

supervisory panel that will meet with the employee after missing two or more days of work per month (Docket No. 10, p. 76 of 685). The VE further testified that if the panel intervention was not successful in lowering the amount of tardy and absent days, the employee would be terminated (Docket No. 10, p. 76 of 685). Additionally the VE stated, "if an employee is going to be off-task 10 percent or more of the time, I believe that completely eliminates the competitive work routine at any level" (Docket No. 10, p. 77 of 685).

During cross-examination, Plaintiff's counsel questioned whether "absences and time-off task . . . [were] . . . not covered in the DOT. . .?" (Docket No. 10, p. 77 of 685). VE Bell testified that absences and time-off task were not covered in the DOT (Docket No. 10, pp. 77-78 of 685).

**B.**     **MEDICAL RECORDS**

    **1.**     **PHYSICAL HEALTH ISSUES**

Plaintiff's relevant medical records date back to November 7, 2008,[4] when Plaintiff was referred to Dr. Anita Hackstedde, MD ("Dr. Hackstedde") for chronic neck and lower back pain that had been present for seven years (Docket No. 10, pp. 377-79 of 685). Plaintiff was on numerous medications, including: Morphine, Lamictal, Levothyroxine, Topamax, Relafen, Lovastatin, Flonase, Symbicort, Albuterol, and Hydroxyzine (Docket No. 10, p. 378 of 685).

On November 12, 2008, Plaintiff underwent an MRI of her cervical and lumbar spine which showed a five-centimeter heterogeneous mass in the right lobe of her thyroid gland, indicating a possible goiter (Docket No. 10, pp. 381, 391 of 685). On November 14, 2008, Plaintiff returned to Dr. Hackstedde suffering from morphine withdrawal (Docket No. 10, p. 354 of 685). Dr. Hackstedde expressed concern about the risks of addiction with chronic narcotics and prescribed a lower dosage of Morphine in limited supply (Docket No. 10, p. 354 of 685). On

---

[4] Plaintiff's medical records actually date back to 2005 (Docket No. 10, pp. 318-46 of 685).

November 28, 2008, Plaintiff underwent real-time sonographic imaging of her neck, tailored to the thyroid bed (Docket No. 10, p. 389 of 685). The test found a partially-visualized solid mass in the left thyroid bed (Docket No. 10, p. 389 of 685).

On December 5, 2008, Plaintiff met with Dr. Trinetta Masternick, DO ("Dr. Masternick") at the Doctor's Pain Clinic ("DPC") for an evaluation of Plaintiff's chronic lower back, thumb, and cervicothoracic pain (Docket No. 10, p. 375 of 685). Dr. Masternick diagnosed Plaintiff with chronic neck and lower back pain, degenerative osteoarthrosis with facet hypertrophy, facet syndrome of the lumbar spine, cervical radiculopathy, cervical and thoracic myalgia pain, and fibromyalgia by history (Docket No. 10, p. 375 of 685). Plaintiff reviewed her opioid contract with Dr. Masternick and was subsequently prescribed Relafen, Morphine Sulfate, Hydroxyzine, and Topamax (Docket No. 10, p. 376 of 685). On January 9, 2009, Plaintiff returned to the DPC for continued evaluation of her chronic pain syndrome, complaining of shoulder pain and "horrible low back pain" that radiated down both of her legs (Docket No. 10, p. 373 of 685). Dr. Masternick refilled Plaintiff's prescriptions and recommended Plaintiff receive an x-ray for her thumb and right facet joint blocks to alleviate some of her pain (Docket No. 10, pp. 373-74 of 685). On January 12, 2009, Plaintiff underwent an x-ray of her left thumb and a biopsy of her left thyroid mass (Docket No. 10, pp. 408, 550 of 685). Plaintiff's thumb x-ray was unremarkable (Docket No. 10, p. 550 of 685). The biopsy showed a benign four-centimeter mass in the left portion of her thyroid bed, indicating a possible hematoma (Docket No. 10, p. 408 of 685).

On January 15, 2009, Dr. Tracy Neuendorf, DO ("Dr. Neuendorf") performed a therapeutic and diagnostic facet joint block on Plaintiff's spine (Docket No. 10, p. 351 of 685).[5]

---

[5] Facet joint blocks are sometimes used in determining the source of back or neck pain. It involves injection of a numbing solution at the site of the nerves supplying a facet joint. Significant decrease in pain following the injection confirms a diagnosis of facet joint syndrome. ATTORNEYS' DICTIONARY OF

Dr. Neuendorf performed this procedure again on January 29, 2009 (Docket No. 10, p. 350 of 685). On February 3, 2009, Plaintiff underwent a CT scan of her left thyroid area (Docket No. 10, p. 407 of 685). The scan showed that Plaintiff had a large mass in her left thyroid area that caused her trachea and esophagus to deviate to the right (Docket No. 10, p. 409 of 685). On February 12, 2009, Plaintiff was admitted to the Austintown Surgery Center for a therapeutic and diagnostic facet block and fluoroscopy (Docket No. 10, p. 349 of 685).

On February 13, 2009, Plaintiff was given her first set of cervical/thoracic trigger points and a left thumb injection (Docket No. 10, p. 371 of 685). Dr. Masternick identified twenty tender trigger points on Plaintiff's cervical/thoracic area and injected those points with Marcaine and Kenalog (Docket No. 10, p. 371 of 685). Dr. Masternick also refilled Plaintiff's prescriptions (Docket No. 10, p. 371 of 685).

On March 6, 2009, Plaintiff returned to Dr. Masternick for continued evaluation of her chronic cervical/thoracic pain and lower back pain (Docket No. 10, p. 369 of 685). Upon examination, Dr. Masternick found multiple tender trigger points around Plaintiff's cervical, thoracic, and lumbar spine (Docket No. 10, p. 369 of 685). Plaintiff was given injections of Marcaine and Kenalog in six trigger points as well as prescription refills (Docket No. 10, p. 369 of 685).

On March 13, 2009, Plaintiff saw Dr. Lawrence Schmetterer, MD ("Dr. Schmetterer") (Docket No. 10, pp. 401-02 of 685). Dr. Schmetterer reviewed the February 3, 2009, CT scan of Plaintiff's neck and noted that there was a mass on her neck just below the left thyroid bed as well as a slight deviation of the trachea (Docket No. 10, pp. 401-02 of 685). Tests were negative for malignant cells (Docket No. 10, pp. 401-02 of 685). Dr. Schmetterer opined that Plaintiff had

---

MEDICINE, F-43288 (2009).

recurrent benign thyroid disease (Docket No. 10, p. 402 of 685).

On March 20, 2009, Plaintiff had a consultation with Dr. David Stepnick, MD ("Dr.
Stepnick") about the mass on her neck (Docket No. 10, p. 465 of 685). Dr. Stepnick
recommended another ultrasound on the neck mass and also discussed the option of neck
surgery, although he expressed reservations about surgery (Docket No. 10, pp. 467-68 of 685).

Plaintiff underwent her third and final set of cervical/thoracic trigger point injections on
March 27, 2009 (Docket No. 10, p. 537 of 685). Plaintiff returned to the DPC on April 24, 2009,
complaining of horrible lower back pain that went down her legs, pain in her right hip and groin,
and numbness in her right foot and toes (Docket No. 10, p. 536 of 685). Plaintiff had multiple
tender trigger points in her cervical/thoracic spine and her pain was so pervasive that Dr.
Masternick stated, "she hurts everywhere I touch" (Docket No. 10, p. 536 of 685). Dr.
Masternick refilled Plaintiff's prescriptions and recommended that Plaintiff undergo a right
lumbar radiofrequency with Dr. Neuendorf (Docket No. 10, p. 536 of 685).

On May 8, 2009, Plaintiff underwent an ultrasound of her neck (Docket No. 10, p. 470 of
685). The examination showed a heterogeneous mass lesion in the left paratracheal space in the
thyroid surgical bed (Docket No. 10, p. 470 of 685).

Plaintiff saw Dr. Masternick on July 10, 2009, complaining of horrible pain and left
thumb pain (Docket No. 10, p. 535 of 685). Plaintiff had multiple tender trigger points in her
cervical/thoracic spine and was given refills of her prescriptions (Docket No. 10, p. 535 of 685).
Plaintiff was also given a prescription for a bilateral hip and pelvis x-ray (Docket No. 10, p. 535
of 685).

Plaintiff returned to Dr. Masternick on August 7, 2009, for continued evaluation of her
chronic pain syndrome (Docket No. 10, p. 534 of 685). Plaintiff stated that she never went for

the ordered bilateral hip and pelvis x-ray (Docket No. 10, p. 534 of 685). Plaintiff continued to have multiple tender trigger points in her cervical/thoracic spine and was given refills of her prescriptions (Docket No. 10, p. 534 of 685).

Plaintiff returned to the DPC on September 4, 2009, for continued evaluation of her chronic pain syndrome (Docket No. 10, p. 532 of 685). Plaintiff complained of horrible pain all over her body, lower back, and both legs (Docket. No. 10, p. 532 of 685). Upon examination, Plaintiff was tender all over her body (Docket No. 10, p. 532 of 685). Dr. Masternick refilled Plaintiff's prescriptions (Docket No. 10, p. 532 of 685).

On January 4, 2010, Dr. Stepnick performed a biopsy of Plaintiff's left paratracheal mass (Docket No. 10, p. 569 of 685).  The excised tissue was benign (Docket No. 10, pp. 569-70 of 685).

On January 8, 2010, Plaintiff went to the DPC for evaluation of her lower back pain which was radiating into her hips and pelvis (Docket No. 10, p. 616 of 685). Plaintiff did have an x-ray of her bilateral hips and pelvis that was completely normal (Docket No. 10, p. 616 of 685). Dr. Masternick recommended that Plaintiff undergo radio-frequency treatment (Docket No. 10, p. 616 of 685). Plaintiff's examination showed increased paravertebral muscles spasms and ten tender trigger points (Docket No. 10, p. 616 of 685). Dr. Masternick refilled Plaintiff's prescriptions (Docket No. 10, p. 616 of 685).

On February 16, 2010, Plaintiff went to the DPC for a re-evaluation of her chronic pain (Docket No. 10, p. 615 of 685). Plaintiff complained of pain all over, including in her lower back, lumbar spine, hips, and both legs (Docket No. 10, p. 615 of 685). Plaintiff also complained of weekly headaches (Docket No. 10, p. 615 of 685). Upon examination, Plaintiff had tenderness in her cervical neck area, post-occipital area, lower back, legs, and down into her thoracic spine

12

(Docket No. 10, p. 615 of 685). Plaintiff also had general muscle and joint pain (Docket No. 10, p. 615 of 685). It was noted that Plaintiff violated her opioid agreement by accepting Toradol from the emergency room (Docket No. 10, p. 615 of 685). Dr. Masternick renewed Plaintiff's prescriptions and Plaintiff was sent for a drug test (Docket No. 10, p. 615 of 685).

On March 18, 2010, Plaintiff went to the DPC for continued evaluation of her chronic pain syndrome (Docket No. 10, p. 613 of 685). Plaintiff had been suffering from migraine headaches as well as episodes during which she could not "pick up" her extremities (Docket No. 10, p. 613 of 685). Plaintiff also complained of chest pains and numbness of her lips and tongue (Docket No. 10, p. 613 of 685). Upon examination, Plaintiff had tenderness in her cervical neck area, post-occipital area, lower back, legs, and down into her thoracic spine (Docket No. 10, p. 613 of 685). Plaintiff also had general muscle and joint pain (Docket No. 10, p. 613 of 685). Dr. Masternick refilled Plaintiff's prescriptions (Docket No. 10, p. 614 of 685).

Plaintiff visited Dr. Hackstedde on March 19, 2010, complaining of parathesias, weakness, jitteriness, and mood swings (Docket No. 10, p. 586 of 685). Dr. Hackstedde prescribed Plaintiff Prozac (Docket No. 10, p. 586 of 685). On April 2, 2010, Plaintiff returned to Dr. Hackstedde complaining of perioral weakness, feelings of weakness, and a possible facial droop (Docket No. 10, p. 585 of 685). There was consensus among all of Plaintiff's physicians that she was suffering from a panic disorder (Docket No. 10, p. 585 of 685). On April 12, 2010, Plaintiff underwent an MRI of her brain (Docket No. 10, p. 621 of 685). The results of the MRI were unremarkable (Docket No. 10, p. 621 of 685).

Plaintiff presented to the DPC on April 22, 2010, for evaluation of her chronic pain syndrome (Docket No. 10, p. 612 of 685). Plaintiff complained of horrible lower back, neck, shoulder, and hand pain (Docket No. 10, p. 612 of 685). Plaintiff stated that she still suffered

from complex migraine headaches (Docket No. 10, p. 612 of 685). Upon examination, Plaintiff

was sore to touch (Docket No. 10, p. 612 of 685). Plaintiff had limited range of motion in her

cervical spine and tenderness in her cervical neck area, post-occipital area, and down into her

lower back (Docket No. 10, p. 612 of 685). Plaintiff also had general muscle and joint pain

(Docket No. 10, p. 612 of 685). Dr. Masternick refilled Plaintiff's prescriptions (Docket No. 10,

p. 612 of 685).

On May 21, 2010, Plaintiff presented to the DPC complaining of horrible pain which had

been aggravated by her frequent trips to the Cleveland Clinic (Docket No. 10, p. 610 of 685).

Plaintiff had limited range of motion in her cervical spine and tenderness in her cervical neck

area, post-occipital area, down into her lower back (Docket No. 10, p. 610 of 685). Plaintiff also

had general muscle and joint pain (Docket No. 10, p. 610 of 685). Dr. Masternick refilled

Plaintiff's prescriptions and gave her a shot of Toradol, per Plaintiff's request (Docket No. 10, p.

611 of 685). Plaintiff was referred to a neurologist and a rheumatologist (Docket No. 10, p. 611

of 685).

On May 22, 2010, Plaintiff presented to the Raleigh General Hospital Emergency Room

where she was treated for a Tylenol overdose that occurred on May 19, 2010 (Docket No. 10, p.

680 of 685). Plaintiff told hospital staff that she tried to commit suicide (Docket No. 10, p. 682

of 685). Plaintiff was given drugs for poison control and it was recommended that she undergo a

psychiatric consultation (Docket No. 10, p. 682 of 685).

 On June 14, 2010, Plaintiff presented to the DPC (Docket No. 10, p. 608 of 685). In the

wake of her overdose, Plaintiff was very emotional and apologetic (Docket No. 10, pp. 608-09 of

685). Upon examination, Plaintiff had pain responses all over her body with even light tactile

stimulation (Docket No. 10, p. 609 of 685). Plaintiff also had very limited range of motion and

14

pain in her lower back and legs (Docket No. 10, p. 609 of 685). Dr. Masternick expressed distrust in the patient with respect to her medication and recommended a one-week supply of Morphine (Docket No. 10, p. 609 of 685).

Plaintiff returned to the DPC on June 22, 2010, complaining of pain in her neck, lower back, shoulders, and arms (Docket No. 10, p. 607 of 685). Upon examination, Plaintiff had tight spasms in the posterior cervical neck on the right side into the right and left shoulders (Docket No. 10, p. 607 of 685). Plaintiff also had tenderness across her lower back and at various trigger points throughout her thoracic area (Docket No. 10, p. 607 of 685). Dr. Neuendorf refilled Plaintiff's prescriptions for a one-week supply (Docket No. 10, p. 607 of 685).

Plaintiff presented to the DPC on June 29, 2010, for continued evaluation of her chronic pain (Docket No. 10, p. 606 of 685). Plaintiff complained of pain in her neck that radiated into both shoulders and down both arms into her hands (Docket No. 10, p. 606 of 685). Plaintiff also complained of pain in her lower back (Docket No. 10, p. 606 of 685). Upon examination, Plaintiff had tenderness and spasms in her neck and shoulder area, limited range of motion in her neck, and tenderness across the lumbar area (Docket No. 10, p. 606 of 685). Dr. Neuendorf renewed Plaintiff's prescriptions and noted a possibility of returning to monthly doses of medication (Docket No. 10, p. 606 of 685).

On July 6, 2010, Plaintiff presented to the DPC for re-evaluation of her chronic pain syndrome (Docket No. 10, p. 605 of 685). Plaintiff complained of pain in her joints, including in her hands, neck, shoulders, and legs (Docket No. 10, p. 605 of 685). Upon examination, Plaintiff had spasms and tenderness in her lower back (Docket No. 10, p. 605 of 685). Plaintiff was icing her left shoulder (Docket No. 10, p. 605 of 685). Dr. Neuendorf renewed Plaintiff's weekly prescription for Morphine (Docket No. 10, p. 605 of 685).

15

On July 13, 2010, Plaintiff returned to the DPC complaining of pain in her lower back, left shoulder, hands, and neck (Docket No. 10, p. 604 of 685). Plaintiff indicated that she had seen a rheumatologist who opined that she did not have arthritis (Docket No. 10, p. 604 of 685). Upon examination, Plaintiff had tender trigger points in her neck and shoulders (Docket No. 10, p. 604 of 685). Dr. Neuendorf renewed Plaintiff's weekly prescriptions, noting that Dr. Masternick would soon determine if Plaintiff could go back to monthly doses (Docket No. 10, p. 604 of 685).

On July 19, 2010, Plaintiff presented to the DPC for evaluation (Docket No. 10, p. 603 of 685). Plaintiff had pain in her lower back and alleged severe hand pain (Docket No. 10, p. 603 of 685). Dr. Masternick found tender trigger points in Plaintiff's neck, shoulders, and lower back (Docket No. 10, p. 603 of 685). Dr. Masternick discussed with Plaintiff her mental health and possible suicidal ideations (Docket No. 10, p. 603 of 685). Satisfied that there was no risk, Dr. Masternick restored Plaintiff's monthly prescription of MS Contin (Docket No. 10, p. 603 of 685). Dr. Masternick also ordered a bilateral upper extremity electromyography study (Docket No. 10, p. 603 of 685). Plaintiff underwent this study on July 28, 2010 (Docket No. 10, p. 573 of 685). The study was normal in both arms; there were no signs of peripheral nerve injury or motor radiculopathy (Docket No. 10, p. 573 of 685).

On October 29, 2010, Plaintiff presented to Dr. Hackstedde for a follow-up appointment (Docket No. 10, p. 669 of 685). Plaintiff had seen a rheumatologist who found no evidence of arthritis or inflammatory myopathy (Docket No. 10, p. 669 of 685). Plaintiff had undergone two of three epidural injections with no significant improvement (Docket No. 10, p. 669 of 685).

Plaintiff met with Dr. Stepnick on August 18, 2010, for a follow-up examination, the first time since January 2010 (Docket No. 10, p. 576 of 685). Plaintiff had mild tenderness along her

16

surgical incision line, as well as problems with her throat and sinuses (Docket No. 10, p. 576 of 685). Plaintiff's scar was well healed and there were no masses of note (Docket No. 10, p. 576 of 685).

On August 19, 2010, Plaintiff presented to the DPC for continued evaluation of her chronic pain syndrome (Docket No. 10, p. 602 of 685). Plaintiff was experiencing horrible cervical neck pain, severe left shoulder pain, and bilateral hand numbness and tingling (Docket No. 10, p. 602 of 685). Dr. Masternick recommended Plaintiff receive epidural injections in her C5-6 vertebrae (Docket No. 10, p. 602 of 685). Upon examination, Plaintiff had tender trigger points in her neck, shoulders, and across the lower back (Docket No. 10, p. 602 of 685). Dr. Masternick refilled Plaintiff's prescriptions (Docket No. 10, p. 602 of 685).

On September 14, 2010, Plaintiff presented to the DPC complaining of left neck pain that radiated down her shoulders into her hands, along with lower back pain that radiated down her legs into her feet (Docket No. 10, p. 601 of 685). Plaintiff had tender trigger points in her neck, shoulders, and lower back (Docket No. 10, p. 601 of 685). Dr. Masternick refilled Plaintiff's prescriptions (Docket No. 10, p. 601 of 685). Plaintiff underwent a therapeutic cervical epidural procedure on September 22, 2010, which provided relief (Docket No. 10, p. 658 of 685).

On October 15, 2010, Plaintiff presented to the DPC with cervical neck pain, left shoulder pain, bilateral leg pain, headaches, foot pain and spasms, and lower back pain (Docket No. 10, p. 600 of 685). Plaintiff stated that the epidural injections only helped for a few days (Docket No. 10, p. 600 of 685). Upon examination, Plaintiff had tender trigger points in her neck, shoulders, and across her lower back (Docket No. 10, p. 600 of 685). Dr. Masternick refilled Plaintiff's prescriptions (Docket No. 10, p. 600 of 685). Plaintiff underwent her second and third set of therapeutic cervical epidurals on October 20, 2010, and November 9, 2010

(Docket No. 10, pp. 656-57 of 685). Plaintiff did well and had relief as a result of the procedure (Docket No. 10, pp. 656-57 of 685).

On February 3, 2011, Plaintiff presented to Dr. Hackstedde for a follow-up claiming physical therapy had not helped with her neck pain (Docket No. 10, p. 668 of 685). Two months later on May 17, 2011, Plaintiff presented to Dr. Hackstedde for another routine follow-up (Docket No. 10, p. 667 of 685). Plaintiff's physical condition was stable (Docket No. 10, p. 667 of 685).

### 2. MENTAL HEALTH ISSUES

Plaintiff began mental health treatment on August 28, 2008, at the Columbiana County Mental Health Center ("CCMHC") (Docket No. 10, p. 449 of 685). Plaintiff wanted to work on feelings associated with her custody battle and history of domestic violence, and symptom management (Docket No. 10, p. 449 of 685). Plaintiff attended numerous therapy and pharmacological managements sessions at CCMHC with Dr. Vincent Paolone, MD ("Dr. Paolone") from April 14, 2009, to October 13, 2009, and from August 28, 2010, through April 8, 2011 (Docket No. 10, pp. 449-59, 555-61, 626-54, 659-66 of 685). Throughout her treatment, Plaintiff was dealing with anxiety and depression, both of which were related to her pain symptoms (Docket No. 10, pp. 653-54 of 685).

Despite no noted suicidal ideations, Plaintiff overdosed on Tylenol on May 19, 2010 (Docket No. 10, p. 680 of 685). In a therapy session on June 23, 2010, Plaintiff denied any suicide attempt and stated that she just did not want to be in pain (Docket No. 10, p. 638 of 685). Dr. Paolone did not alter Plaintiff's medication regimen (Docket No. 10, p. 640 of 685). During a pharmacological management session on August 11, 2010, Dr. Paolone noted that he had limited expectations for Plaintiff's improvement with psychiatric medications and opined that Plaintiff

18

suffered from histrionic personality disorder,[6] which impeded her improvement (Docket No. 10, p. 632 of 685).

C.     EVALUATIONS

       1.     PSYCHOLOGICAL EVALUATION

       On March 25, 2009, Dr. Paolone submitted a Mental Status Report at the request of the Bureau of Disability Determination ("BDD") (Docket No. 10, pp. 418-22 of 685). In the report, Dr. Paolone noted that Plaintiff's appearance was always neat and her speech was normal (Docket No. 10, p. 420 of 685). Dr. Paolone reported that Plaintiff's cognitive functioning was basically intact, along with her insight and judgment (Docket No. 10, p. 420 of 685). Plaintiff was diagnosed with Mood Disorder Not Otherwise Specified and Attention Deficit Hyperactivity Disorder ("ADHD") (Docket No. 10, p. 421 of 685). Dr. Paolone found Plaintiff to be limited in her ability to: (1) remember, understand and follow directions; (2) maintain attention; and (3) sustain concentration, persist at tasks, and complete them in a timely fashion (Docket No. 10, p. 421 of 685). Dr. Paolone also opined that Plaintiff would have difficulty reacting to pressure involved in simple and routine tasks (Docket No. 10, p. 421 of 685).

       On that same day, social worker Vicki Pelletier ("Ms. Pelletier") filled out a Daily Activities Questionnaire at the request of BDD (Docket No. 10, pp. 423-24 of 685). Ms. Pelletier opined that Plaintiff would have difficulty working because she has trouble maintaining focus, is extremely sad, and lacks interest (Docket No. 10, p. 423 of 685). Ms. Pelletier noted that Plaintiff's ability to prepare food, drive, bank and pay bills was good but reported that Plaintiff

---

[6] A character or personality disorder marked by exaggerated emotionality and a behavior that solicits attention. Additional symptoms include abnormal concern with physical attractiveness and sexual seductiveness, rapid shifting of emotions, and insistence on immediate gratification. ATTORNEYS' DICTIONARY OF MEDICINE, H-55566 (2009).

had difficulty doing some household chores and fitting in socially (Docket No. 10, p. 424 of 685).

On June 3, 2011, Dr. Paolone completed a Medical Source Statement regarding Plaintiff's mental capacity (Docket No. 10, p. 676 of 685). Dr. Paolone determined that Plaintiff had a moderately impaired ability to: (1) follow work rules; (2) use judgment; (3) deal with the public; (4) function independently; (5) understand, remember and carry out simple job instructions; and (6) socialize (Docket No. 10, pp. 676-77 of 685). Plaintiff had poor ability to: (1) maintain attention and concentration for extended periods of two-hour segments; (2) respond appropriately to changes in routine settings; (3) maintain regular attendance and be punctual within customary tolerances; (4) deal with the public; (5) interact with supervisors; (6) work in coordination with or proximity to others without being unduly distracted or distracting; (7) deal with work stresses; (8) complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (9) understand, remember, and carry out complex job instructions; (10) understand, remember and carry out detailed, but not complex job instructions; (11) behave in an emotionally stable manner; (12) relate predictably in social situations; and (13) manage funds/schedules (Docket No. 10, pp. 676-77 of 685).

**2.      PSYCHIATRIC REVIEW TECHNIQUES**

State examiner Dr. Alice Chambly ("Dr. Chambly") completed two Psychiatric Review Techniques; one on May 27, 2009, concerning Plaintiff's current mental functioning (Docket No. 10, pp. 482-95 of 685), and one on May 28, 2009, concerning Plaintiff's functioning from January 3, 2008, through September 30, 2008 (Docket No. 10, pp. 496-509 of 685). In both

evaluations when assessing "Paragraph B" criteria,[7] Dr. Chambly found Plaintiff to have a mild

degree of limitation with regard to her activities of daily living, social functioning, and

maintaining concentration, persistence, or pace (Docket No. 10, pp. 492, 506 of 685). Dr.

Chambly found no episodes of decompensation or evidence of "Paragraph C" criteria[8] (Docket

No. 10, pp. 492-93, 506-07 of 685).

### 3. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a Physical Residual Functional Capacity Assessment with state

examiner Dr. W. Jerry McCloud, MD ("Dr. McCloud") on July 20, 2009 (Docket No. 10, pp.

510-17 of 685). Dr. McCloud determined that Plaintiff could: (1) occasionally lift twenty

pounds; (2) frequently lift ten pounds; (3) stand and/or walk for a total of six hours in an eight-

hour workday; (4) sit for six hours in an eight-hour workday; and (5) push and/or pull in a

limited capacity (Docket No. 10, p. 511 of 685). Plaintiff could never climb ladders, ropes, or

scaffolds, and only occasionally stoop and crouch (Docket No. 10, p. 512 of 685). Dr. McCloud

determined that Plaintiff had no manipulative, visual, communicative, or environmental

limitations (Docket No. 10, pp. 513-14).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI

are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.

*Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those

who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is

---

[7] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[8] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . .  physical or mental ability to do basic work activities." *Id.* (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS

22

126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)). The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ LaVicka made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through September 30, 2008.

2. Plaintiff has not engaged in substantial gainful activity since January 3, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: cervical radiculopathy, osteoarthritis of the lumbar spine, occasional migraine headaches, history of fibromyalgia, anxiety, organic mental disorder, and affective disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform light work except that the type of work must: provide a sit/stand option allowing Plaintiff to change between sitting and standing for one to two minutes at thirty minute intervals without breaking task; entail no climbing ladders/ropes/scaffolds and no more than occasional other postural movements; entail no exposure to hazards (i.e.

23

unprotected heights or dangerous machinery); be limited to simple, routine, and repetitive tasks in a work environment free of fast paced production and involving simple work-related decisions with few, if any, work place changes; must entail no more than occasional interaction with the public and co-workers.

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was born on February 3, 1969, and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from January 3, 2008, through the date of this decision.

(Docket No. 10, pp. 18-29 of 685). ALJ LaVicka denied Plaintiff's request for DIB and SSI

benefits (Docket No. 10, p. 29 of 685).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to

42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d

830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the

Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard

or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v.

Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any

fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833

24

(*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that the ALJ erred by: (1) not giving adequate consideration to Plaintiff's subjective allegations; and (2) failing to follow the treating physician rule and not assigning controlling weight or giving deference to the opinion of Plaintiff's treating psychiatrist, Dr. Paolone (Docket No. 20).

### B.   DEFENDANT'S RESPONSE

Defendant contends that substantial evidence exists to support the ALJ's consideration of Plaintiff's subjective allegations and his decision not to apply controlling weight to Dr. Paolone's findings (Docket No. 21).

### C.   DISCUSSION

#### 1.   PLAINTIFF'S SUBJECTIVE STATEMENTS AND CREDIBILITY

Plaintiff alleges that the ALJ erred by not giving adequate consideration to her subjective statements and credibility (Docket No. 20, pp. 11-15 of 20). The ALJ found that Plaintiff "has a treatment history which fails to demonstrate a condition of the degree of severity which she has

alleged, and she has engaged in significant daily activities including the care of a young child. Accordingly . . . [Plaintiff's] credibility is, at best, fair" (Docket No. 10, p. 26 of 685).

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (per curiam) (*citing Kirk v. Secy's of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981)). The Social Security Administration provides guidelines as to how an ALJ should evaluate a claimant's symptoms, including pain. Under 20 C.F.R. § 404.1529(a), the Social Security Administration considers:

> all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . We will consider all of your statements  about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that you are disabled.

20 C.F.R. § 404.1529(a). Where a claimant's subjective allegations suggest more severe symptoms than would reasonably be expected to be produced by benign or questionable medical findings, it is the ALJ who is responsible for making credibility determinations under established guidelines. 20 C.F.R. § 404.1529(c)(1)-(4), 416.929(c)(1)-(4).

Social Security Ruling 96-7p provides the framework under which an ALJ must analyze a claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant

26

evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005).

ALJ LaVicka opined that, while Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not credible (Docket No. 10, p. 23 of 685). Plaintiff, in her Adult Disability Report, alleged disability due to "fibromyalgia, depression, migraines, restless leg syndrom[e], cervical and lumbar myofascial, cervical radiculopathy, bipolar, chronic pain in neck and back, [and] degenerative osteoarthritis" (Docket No. 10, p. 202 of 685). She reported that these impairments limited her ability to work because she "can't hardl[y] do anything . . . can't stand, sit, walk, [or] lay down for any period of time" (Docket No. 10, p. 202 of 685). During her testimony, Plaintiff stated that her most limiting impairments were the pain in her lower back, pelvis, legs, and shoulders (Docket No. 10, p. 55 of 685). Plaintiff also stated that she had "very painful" joint pain and muscular fatigue, migraines that had become progressively worse since 2002, depression because of her pain, ADHD, and "horrible anxiety" (Docket No. 10, pp. 55-60 of 685).

There is no doubt that Plaintiff suffers from neck, shoulder, and back issues as well as

some mental health issues. However, as ALJ LaVicka pointed out, Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are inconsistent with the objective medical evidence (Docket No. 10, p. 23 of 685). Plaintiff has not undergone any surgery for her back or neck pain, MRI scans have shown no significant central canal stenosis, and her EMG scans were normal (Docket No. 10, pp. 381, 391, 573 of 685). Plaintiff also underwent a series of facet nerve block procedures, which reportedly provided her with significant relief from her back pain (Docket No. 10, pp. 656-58 of 685). Additionally, it is of note that none of Plaintiff's treating physicians assigned her work-related restrictions (Docket No. 10, pp. 318-685 of 685). If Plaintiff's symptoms were as severe and debilitating as she claimed, it seems logical to infer that one of her numerous treating physicians would have limited Plaintiff's ability to work. In fact, review of the record shows that Plaintiff was under no restrictions whatsoever, work-related or otherwise (Docket No. 10, pp. 318-685 of 685).

With regard Plaintiff's mental health issues, there is little evidence that these issues leave her totally disabled. In fact, Dr. Paolone's own assessment of Plaintiff was that her psychiatric medications would have limited effects in improving her situation because Plaintiff has issues with attention seeking or "Histrionic Personality [Disorder]" which "likely [are a] significant component . . . in her chronic pain" (Docket No. 10, p. 632 of 685). This statement alone is sufficient to undermine Plaintiff's claims of both physical and mental disability. A need for attention does not render Plaintiff unable to work.

Furthermore, there is some doubt concerning Plaintiff's alleged suicide attempt. While Plaintiff stated that she wanted to end her life immediately after her overdose and while still in the emergency room, Plaintiff later denied any suicide attempt and told her treating psychiatrist that she just did not want to be in pain (Docket No. 10, pp. 638, 640 of 685). Mental health

28

treatment records indicate that Plaintiff never expressed any suicidal ideation (Docket No. 10, pp. 449-59, 555-61, 626-54, 659-66 of 685). During her testimony, however, Plaintiff again stated that she wanted to kill herself (Docket No. 10, p. 72 of 685). There were also trust issues between Plaintiff and her treating physicians, especially with regard to Plaintiff's use and potential abuse of prescription pain medication (Docket No. 10, pp. 608-09 of 685).

Based on a thorough examination of the record, the Magistrate finds that Plaintiff's subjective allegations with regard to her pain, migraines, and mental health issues are not supported by substantial evidence in the record. Therefore, Plaintiff's first assignment of error is without merit and the decision of the Commissioner is affirmed as to this issue.

## 2. TREATING PHYSICIAN RULE

Plaintiff next alleges that the ALJ violated the treating physician rule by failing to assign controlling weight to Dr. Paolone's opinion (Docket No. 20, pp. 15-20 of 20). The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not

accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

[T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). ALJ LaVicka gave the opinion of Dr. Paolone, Plaintiff's treating psychiatrist, little weight, stating that the doctor's assessments were "cursory and limited," "contradictory," and "inconsistent with the evidence as a whole" (Docket No. 10, p. 27 of 685).

Specifically, ALJ LaVicka found issue with Dr. Paolone's mental status questionnaire and medical source statement assessments (Docket No. 10, p. 27 of 685). ALJ LaVicka opined that the questionnaire, conducted on March 25, 2009, failed to specify and define the degree of Plaintiff's limitations (Docket No. 10, p. 27 of 685). In the questionnaire, Dr. Paolone simply described patient's ability to remember, understand and follow directions, maintain attention, and sustain concentration, and persist at tasks and complete them in a timely fashion as limited (Docket No. 10, p. 421 of 685). The single-word description of "limited" does not illustrate the severity of Plaintiff's limitations in the foregoing categories and therefore undermines the usefulness of Dr. Paolone's classification. With regard to Plaintiff's medical source statement, ALJ LaVicka found that Dr. Paolone "greatly overstate[d]" the degree of Plaintiff's limitations (Docket No. 10, p. 27 of 685). Dr. Paolone classified Plaintiff's ability to understand and remember and carry out simple job instructions as moderately limited, but not precluded (Docket

30

No. 10, p. 676-77 of 685). ALJ LaVicka noted that this classification was inconsistent with Plaintiff's daily activities, which included childcare and impeccable grooming (Docket No. 10, p. 27 of 685).

While ALJ LaVicka set forth a few reasons why Dr. Paolone's opinion was given "limited weight," a few is not enough. As stated by the Sixth Circuit, "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson*, 378 F.3d at 544). ALJ LaVicka quickly referenced the inconsistency of Dr. Paolone's opinion with the record as a whole, but failed to address that factor in any meaningful level of detail (Docket No. 10, p. 27 of 685). The nature and extent of the treatment relationship and supportability were referenced, but in an unconvincing fashion (Docket No. 10, pp. 25, 27 of 685). Additionally, ALJ LaVicka failed to address the length of the treatment relationship between Plaintiff and Dr. Paolone, the frequency of examination, and the specialization of the treating source (Docket No. 10, p. 27 of 685). It should be noted that plenty of evidence exists in the record to support the ALJ's assignment of weight, but the ALJ failed to cite or discuss this evidence.

For example, Dr. Paolone consistently noted that Plaintiff was "impeccably/stylishly dressed and groomed" (Docket No. 10, p. 661 of 685). Plaintiff testified that she participated, along with her husband, in caring for her nine-year-old daughter (Docket No. 10, p. 61 of 685), doing the laundry, and occasionally going grocery shopping (Docket No. 10, p. 62 of 685). Plaintiff stated that she makes her bed everyday, dusts, and wipes down the bathroom fixtures

31

(Docket No. 10, pp. 62-63 of 685). She also indicated that she can dress and bathe herself (Docket No. 10, p. 61 of 685). Plaintiff testified that she was able to leave her house to visit her parents and attend church on Sundays (Docket No. 10, pp. 64-65 of 685). Plaintiff also stated that she drove seven hours to Lancaster, Pennsylvania alone (Docket No. 10, p. 65 of 685).

Mental health treatment notes from August 2010 through April 2011 found that Plaintiff was making at least some, if not good, progress towards her treatment goals (Docket No. 10, pp. 626-54, 659-66 of 685). Plaintiff was described as motivated (Docket No. 10, p. 646 of 685) and enthusiastic (Docket No. 10, p. 652 of 685). Despite her Tylenol overdose in May 2010, Plaintiff never presented as suicidal (Docket No. 10, pp. 626-54, 659-66 of 685) and later denied the overdose was a suicide attempt (Docket No. 10, p. 640 of 685). The ALJ failed to include most of this information in his decision (Docket No. 10, pp. 18-29 of 685).

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." *Id*. (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)). As set forth by the Sixth Circuit, "[w]e do not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley*, 573 F.3d at 267.

Based on the ALJ's failure to abide by the requirements of the treating physician rule, the Magistrate must remand this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## VII. CONCLUSION

For the foregoing reasons, this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) and the Commissioner is ordered to consider the medical source opinion of Dr. Paolone and articulate the weight accorded to this evidence, . The decision of the Commissioner with regard to Plaintiff's first assignment of error concerning Plaintiff's credibility is affirmed.

**IT IS SO ORDERED.**


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   May 14, 2013